**CENTER FOR AUTO SAFETY, INC., et al., Appellants,**

**v.**

**Drew LEWIS, Secretary, Department of Transportation, et al.**

**No. 81-2270.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 23, 1982.

Decided Aug. 10, 1982.

Barbara L. Bezdek, Washington, D. C., for appellants.

Enid Rubenstein, Attorney, National Highway Traffic Safety Administration, Washington, D. C., with whom Frank A. Berndt, Chief Counsel, David W. Allen, Asst. Chief Counsel, Bruce C. Buckheit and Eileen T. Leahy, Attorneys, National Highway Traffic Safety Administration, Washington, D. C., were on the brief for appellees.

Before EDWARDS, Circuit Judge, ROBB, Senior Circuit Judge and JAMES F. GORDON,* United States District Judge for the Western District of Kentucky.

ROBB, Senior Circuit Judge:

In this case in the District Court The Center for Auto Safety and others, all of whom we shall refer to collectively as the "Center", challenged the settlement by the Secretary of Transportation of a safety defect investigation concerning some 23 million Ford vehicles. The investigation was conducted by the National Highway Traffic Safety Administration pursuant to the National Traffic and Motor Vehicle Safety Act of 1966. 15 U.S.C. § 1381 *et seq.*[1] It was prompted by reports that the automatic transmissions in the Ford cars caused many accidents by failing to hold or engage in Park and slipping into Reverse gear, commonly when the driver was outside the vehicle and thus unable to control the unexpected movement. Without making a final determination that a defect existed, the Secretary settled the case by requiring Ford

to send warnings to the owners of the relevant vehicles, together with cautionary stickers to be attached to the dashboards of their automobiles. The Center maintained that the Secretary lacked authority to settle defect investigations except in return for the remedies specified in 15 U.S.C. § 1414. Referring to those remedies, the Center sought an order from the District Court requiring the Ford Motor Company, pursuant to 15 U.S.C. § 1414(a)(2)(A), to repair or replace without charge the allegedly defective vehicles, some ten million in number, or refund the price paid for them. In the alternative the Center argued that the Secretary acted arbitrarily in making the settlement. The District Court granted the defendant's motion for summary judgment, upon the ground that the Secretary's decision to settle with Ford was a reasonable exercise of his discretion. The Center appeals. We hold that in the circumstances presented here the Secretary's settlement did not violate 15 U.S.C. § 1414 and did not constitute arbitrary agency action. Accordingly we affirm the judgment of the District Court.

The purpose of the National Traffic and Motor Vehicle Safety Act, as declared by Congress, is "to reduce traffic accidents and deaths and injuries ... resulting from traffic accidents." 15 U.S.C. § 1381. Among the means chosen by Congress to accomplish this purpose is the requirement that motor vehicles be recalled if it is determined by the Secretary of Transportation or by the vehicle manufacturer that they contain a defect which relates to motor vehicle safety.

The Act defines defect to include "any defect in performance, construction, components, or materials" in motor vehicles or motor vehicle equipment. 15 U.S.C. § 1391(11). Motor vehicle safety is defined as

the performance of motor vehicles ... in such a manner that the public is protect-

---

\* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Pub.L.No.89–563, 80 Stat. 718, as amended by The Motor Vehicle and Schoolbus Safety

Amendments of 1974, Pub.L.No.93–492, 88 Stat. 1470, codified at 15 U.S.C. § 1381 *et seq.* Throughout this opinion we refer to the statute by its codified section numbers.

ed against unreasonable risk of accidents occurring as a result of the design, construction or performance of motor vehicles, and is also protected against unreasonable risk of death or injury to persons in the event accidents do occur....

15 U.S.C. § 1391(1).

The Act, 15 U.S.C. § 1412, provides for two stages in the conduct of investigations of alleged defects.[2] Section 1412(a) governs the first stage, generally referred to as the "initial determination", see 49 C.F.R. § 554.10. It provides that "[i]f through testing, inspection, investigation ... or otherwise, the Secretary determines that any motor vehicle ... contains a defect which relates to motor vehicle safety," the Secretary shall immediately notify the manufacturer and publish notice of the determination in the Federal Register. The notification to the manufacturer "shall include all information upon which the determination of the Secretary is based." Section 1412(a) requires that the Secretary then afford the manufacturer "an opportunity to present data, views, and arguments to establish

that there is no defect ...." Section 1412(b) governs the second stage of the investigative process, generally referred to as the "final determination", see 49 C.F.R. § 554.11. It provides:

> If, after such presentations by the manufacturer and interested persons, the Secretary determines that such vehicle ... contains a defect ... the Secretary shall order the manufacturer (1) to furnish notification ... to owners, purchasers and dealers in accordance with section 1413 of this title, and (2) to remedy such defect ... in accordance with section 1414 of this title.

15 U.S.C. § 1412(b).

As indicated in the last clause of section 1412(b), section 1414 focuses on remedies. Section 1414(a)(1) provides, "If notification is required ... by an order under section 1412(b) ... then the manufacturer ... shall cause such defect to be remedied without charge."[3] Section 1414(a)(2)(A) provides that when a vehicle is presented for remedy pursuant to notification, the manufacturer

---

2. Section 1412 reads in full as follows:

(a) If through testing, inspection, investigation, or research carried out pursuant to this chapter, or examination of communications under section 1418(a)(1) of this title, or otherwise, the Secretary determines that any motor vehicle or item of replacement equipment—

(1) does not comply with an applicable Federal motor vehicle safety standard prescribed pursuant to section 1392 of this title; or

(2) contains a defect which relates to motor vehicle safety;

he shall immediately notify the manufacturer of such motor vehicle or item of replacement equipment of such determination, and shall publish notice of such determination in the Federal Register. The notification to the manufacturer shall include all information upon which the determination of the Secretary is based. Such notification (including such information) shall be available to any interested person, subject to section 1418(a)(2)(B) of this title. The Secretary shall afford such manufacturer an opportunity to present data, views, and arguments to establish that there is no defect or failure to comply or that the alleged defect does not affect motor vehicle safety; and shall afford other interested persons an opportunity to

present data, views, and arguments respecting the determination of the Secretary.

(b) If, after such presentations by the manufacturer and interested persons, the Secretary determines that such vehicle or item of replacement equipment does not comply with an applicable Federal motor vehicle safety standard, or contains a defect which relates to motor vehicle safety, the Secretary shall order the manufacturer (1) to furnish notification respecting such vehicle or item of replacement equipment to owners, purchasers, and dealers in accordance with section 1413 of this title, and (2) to remedy such defect or failure to comply in accordance with section 1414 of this title.

15 U.S.C. § 1412.

3. Section 1414 reads in relevant part as follows:

(a)(1) If notification is required under section 1411 of this title or by an order under section 1412(b) of this title, with respect to any motor vehicle or item of replacement equipment which fails to comply with an applicable Federal motor vehicle safety standard or contains a defect which relates to motor vehicle safety, then the manufacturer of each such motor vehicle or item of replacement equipment presented for remedy pursuant to such notification shall cause such defect or failure to comply in such motor vehicle or such item of replacement

shall cause the vehicle to be remedied by whichever of the following means he elects:

(i) By repairing such vehicle.

(ii) By replacing such motor vehicle without charge, with an identical or reasonably equivalent vehicle.

(iii) By refunding the purchase price of such motor vehicle in full, less a reasonable allowance for depreciation.

The Secretary has delegated to the National Highway Traffic Safety Administrator the authority to "[c]arry out the National Traffic and Motor Vehicle Safety Act, as amended." 49 C.F.R. § 1.50(a). For convenience we shall refer to the statute as the "Motor Vehicle Safety Act" or the "Act".

Following the procedures set out in the Act the National Highway Traffic Safety Administration (NHTSA) made an investigation of reports of "inadvertent rearward movement" of Ford vehicles. The investigation began in October 1977, lasted over two and one-half years, and culminated in June 1980 in an "Investigative Report, Phase I" by the Office of Defects Investigation ["ODI Phase I Report"]. In the course of its investigation the NHTSA staff inspected vehicles that had failed, and sponsored testing programs conducted by outside contractors, to measure and compare the physical differences of Ford, General Motors and Chrysler park mechanisms. Ford's own internal analyses and reports concerning the transmissions' performance were examined by NHTSA's technical staff. NHTSA also obtained and reviewed the analyses of General Motors' and Chrysler's automatic transmissions' park characteristics, and GM's and Chrysler's engineering analyses of the Ford transmissions. Outside transmission experts' analyses were also obtained and reviewed by NHTSA. NHTSA's staff examined the proposed and actual design changes devised by Ford engineers for the 1980 model year. In addition to investigation of possible mechanical and design flaws, NHTSA's staff studied the effect of "driver interaction" with the vehicle.

The ODI Phase I Report stated:

The NHTSA has received reports of over twenty-three thousand failures from Ford Motor Company, and from consumers, either directly or through state and private consumer groups, regarding problems of inadvertent vehicle movement on Ford built vehicles.

(J.A. 51)

The investigation dealt with 23 million vehicles, dating back to 1970, equipped with

---

equipment to be remedied without charge. In the case of notification required by an order under section 1412(b) of this title, the preceding sentence shall not apply during any period during which enforcement of the order has been restrained in an action to which section 1415(a) of this title applies or if such order has been set aside in such an action.

(2)(A) In the case of a motor vehicle presented for remedy pursuant to such notification, the manufacturer (subject to subsection (b) of this section) shall cause the vehicle to be remedied by whichever of the following means he elects:

(i) By repairing such vehicle.

(ii) By replacing such motor vehicle without charge, with an identical or reasonably equivalent vehicle.

(iii) By refunding the purchase price of such motor vehicle in full, less a reasonable allowance for depreciation.

Replacement or refund may be subject to such conditions imposed by the manufacturer as the Secretary may permit by regulation.

(B) In the case of an item of replacement equipment the manufacturer shall (at his election) cause either the repair of such item of replacement equipment, or the replacement of such item of replacement equipment without charge with an identical or reasonably equivalent item of replacement equipment.

(3) The dealer who effects remedy pursuant to this section without charge shall receive fair and equitable reimbursement for such remedy from the manufacturer.

(4) The requirement of this section that remedy be provided without charge shall not apply if the motor vehicle or item of replacement equipment was purchased by the first purchaser more than 8 calendar years (3 calendar years in the case of a tire, including an original equipment tire) before (A) notification respecting the defect or failure to comply is furnished pursuant to section 1411 of this title, or (B) the Secretary orders such notification under section 1412 of this title, whichever is earlier.

15 U.S.C. § 1414.

five major types of automatic transmissions, and over twenty types of transmission control systems, depending on the type of vehicle, size of the engine and options ordered with the vehicle. The vehicles comprise nearly 20 percent of all passenger vehicles on the highways. (Appellee's Br. at 7); ODI Phase I Report at 98. NHTSA amassed over 382 cubic feet of documents relating to the investigation, including reports of park-to-reverse accidents, blueprints of the transmissions, and engineering evaluations of various types of transmissions; and conducted examinations of state accident records, human factors studies and a number of tests aimed at providing some understanding of the cause of the accidents which were being reported to NHTSA.

The investigation also revealed reports of similar accidents occurring in vehicles with automatic transmissions manufactured by General Motors Corporation, Chrysler Corporation and others. ODI Phase I Report at 13, 15. Examination of Ford vehicles reported to have been involved in a "park-to-reverse" incident revealed that following the reported incident, the park system appeared to function normally in most instances. *Id.* at 11, 27.

The Report conceded that a number of reports of failure had been received with respect to vehicles manufactured by competitors of Ford, and that these failures were the result of poor adjustment, worn or deteriorated parts, manufacturing errors, or in some cases, the failure of the vehicle operator to place the selector in the full Park position, and that some Ford failures must also be attributed to these same causes. However, the NHTSA concluded that the failure rate in Ford vehicles was much greater than the rate in other vehicles, and that the large difference was the result of unique Ford characteristics. Accordingly, on June 19, 1980 NHTSA made its "initial determination" under 15 U.S.C. § 1412 that a safety-related defect existed in the Ford vehicles. 45 Fed.Reg. 41,564 (June 19, 1980).

Throughout the investigation Ford contended that the vehicles in question did not contain a defect. According to Ford the operators of all makes of vehicles occasionally fail to engage Park properly, and Ford vehicles were not more likely than their competitors' products to slip into reverse if the gear shift lever was not properly secured in the Park position. As for the alleged reports of over twenty-three thousand failures in Ford vehicles, Ford said these statistics were faulty and unreliable because the reports contained either "fact patterns irrelevant to this investigation or insufficient information to ascertain whether the circumstances are relevant to the issues under investigation." (J.A. 221–22) Ford contended that "the agency has actually received relatively few reports that are even arguably pertinent to prove the existence" (J.A. 222) of the alleged defect. In the opinion of Ford the reports of occurrences involving Ford vehicles had been stimulated and their numbers inflated by publicity about the investigation.

On October 3, 1980 NHTSA Administrator Joan Claybrook sent the Secretary of Transportation a memorandum headed "ACTION: Ford Transmission Case". The memorandum stated:

> Subject to your approval I intend to make a final determination that all 1970–1979 Ford vehicles equipped with FMX, C-3 and C-4 automatic transmissions contain a defect which relates to motor vehicle safety and to order Ford Motor Company to remedy its 1973–1979 vehicles equipped with these transmissions, as required by the Traffic Safety Act. Approximately ten million vehicles in service would be affected by this order. If this recall follows prior patterns, approximately half of these vehicles will actually receive the necessary repair.
>
> *   *   *   *   *   *
>
> A final determination and recall order is necessary with respect to the FMX, C-3 and C-4 transmissions because the evidence indicates that they are defective and that they may require mechanical alteration in order to remedy the defect.

(J.A. 293, 306)

The Administrator added that she also believed that "1970–1979 Ford vehicles

equipped with C–6 and JATCO transmissions contain a defect which relates to motor vehicle safety.". However because "the remedy for these vehicles may be simpler than for vehicles with FMX, C–3 and C–4 transmissions" she planned "to negotiate this matter [of C–6 and JATCO transmissions] with Ford." (J.A. 293)

At the end of the Administrator's memorandum there were two blank lines for the Secretary's signature, one line labelled "APPROVED" and the other "DISAPPROVED". The Secretary however never signed on either line; and no other document which is alleged to contain a final determination of defect was issued by NHTSA or the Secretary.

In November 1980 the General Counsel to the Transportation Department, Thomas G. Allison, acting pursuant to instructions from the Secretary, started negotiations with Ford. On December 30, 1980 Allison, in his new capacity as Acting Secretary of Transportation, reached a settlement of the case. The settlement required Ford to send letters to all owners of vehicles with the relevant transmissions, informing them of NHTSA's initial defect determination. The settlement also required Ford to enclose with the letters self-sticking warning labels reminding the driver to place the transmission securely in Park, shut off the engine, and set the parking brake before leaving the car.[4] In his letter confirming the agreement [5] Acting Secretary Allison stated that Ford's proposed notification letter and warning label "would adequately address our motor vehicle safety concerns ... at this time." The letter noted the Department did not agree with Ford's position on the merits, and that the settlement reserved the Department's right to take further action if warranted by subsequent developments. As agreed, Ford sent the letters and labels. The Department closed the case.

On March 6, 1981 the Center for Auto Safety, several other consumer groups and four individual automobile owners sued the Secretary and the Administrator of

---

4. The label is designed to be affixed to the dashboard or other conspicuous place, and reads as follows:

| Before leaving the driver's seat, you should always: | 1. Make sure the gear selector lever is engaged in Park. |
| | 2. Set the parking brake fully. |
| | 3. Shut off the ignition. |

* Unexpected and possibly sudden vehicle movement may occur if these precautions are not taken.

* Refer to your owner's manual for other important safety information.

5. The letter reads as follows:

DEC 30 1980

Mr. Herbert L. Misch
Ford Motor Company
The American Road
Dearborn, Michigan 48121
Dear Mr. Misch:

This correspondence responds to your letter of December 30, 1980, which reports on Ford's conclusions regarding ODI Case C8–02. We have also reviewed the proposed owner letter and the language of the safety label which you enclosed and look forward to reviewing the label format.

Without agreeing with your interpretation of the merits of this safety controversy as stated in your December 30, 1980, letter, we believe Ford's sending of the proposed notification letter and safety label to the owners of all vehicles covered by Deputy Administrator Amato's June 9, 1980, initial defect determination would adequately address our motor vehicle safety concerns in this matter at this time. We believe this action would be likely to reduce significantly the incidence of accident, death and injury resulting from unexpected rearward vehicle movement after the driver has attempted to shift the gear selector lever to "P" (Park) and would fulfill the requirements of the National Traffic and Motor Vehicle Safety Act of 1966, as amended. In view of Ford's intention to take this action, NHTSA considers the matter resolved, and ODI Case C8–02 will therefore be closed as soon as the report described by 15 U.S.C. 1414(c) and by 49 C.F.R. Part 573 is received and Ford advises the agency that the letters and labels have been mailed. The National Highway Traffic Safety Administration, however, reserves its right to take whatever action may be required under the statute and warranted by the development of its knowledge in this matter based upon additional facts. Furthermore, if Ford should develop such facts, we fully expect that Ford will immediately bring them to the agency's attention and that Ford would take whatever remedial action those facts require under the Safety Act.

Sincerely,
/s/ Thomas G. Allison
THOMAS G. ALLISON
Acting Secretary

NHTSA. The plaintiffs sought to enjoin the settlement and to compel a recall or other remedy involving mechanical repair or replacement of the vehicle as provided in 15 U.S.C. § 1414. On October 21, 1981 the District Court granted the government's motion for summary judgment.[6]

■ The Center argues here that the Secretary of Transportation lacks authority to settle a safety defect investigation for any form of relief short of one of the three remedies prescribed by Congress in section 1414(a)(1)—repair, replacement, or refund of purchase price. We are not persuaded by the argument, because neither the Secretary nor anyone else made a final determination under section 1412(b) that the vehicles under investigation contained a "defect which relates to motor vehicle safety."[7] The statute requires such a determination before the remedy-without-charge obligation attaches. This becomes clear when the steps in the statutory procedure are examined. Thus section 1412(a) provides for a hearing or other opportunity for the manufacturer to argue that there is no defect. Section 1412(b) says that if after such a presentation by the manufacturer the Secretary determines that a defect exists he shall order the manufacturer to notify owners and to remedy the defect in accordance with section 1414. Continuing, section 1414(a)(1) provides that *if* the Secretary orders notification under section 1412(b) the manufacturer shall cause the defect to be remedied without charge. Specifically, section 1414(a)(1) reads: "*If* notification is required . . . by an order under section 1412(b) . . . then the manufacturer . . . shall cause such defect . . . to be remedied without charge." [emphasis added] The plain meaning of this language is that a determination and order under section 1412(b) are prerequisites to the remedy obligations under section 1414(a)(1) and the remedies specified in section 1414(a)(2)(A).

Absent a section 1412(b) determination and order section 1414 does not apply; and here there was neither a determination nor an order under section 1412(b).

Our interpretation of sections 1412 and 1414 is consistent with the statutory scheme. Under section 1412(a) the "initial determination" of defect is based on the Department's own testing and investigation. All that follows the initial determination is notification to the manufacturer, publication of a notice in the Federal Register, and an opportunity for the manufacturer to present data and arguments. In contrast, the "final determination" under section 1412(b) is based on the more extensive record developed "after such presentations by the manufacturer and interested persons." Accordingly, the consequences following a final determination become far more burdensome: (1) the manufacturer must send a detailed notification to all vehicle owners and dealers; and (2) the manufacturer must comply with the repair, replace or refund requirements of section 1414. Thus the statute contemplates two separate determinations which lead to progressively more severe consequences. Such a mechanism allows the Secretary to make a tentative decision, hold hearings to gather more information, and then reevaluate the earlier determination on the basis of a more complete record. The Center's argument that section 1414 applies when only the initial determination has been made would treat the tentative, initial determination as the final decision and defeat the statutory scheme.

Acceptance of the Center's argument would lead to unreasonable results. An order issued under section 1412(b) is not self-enforcing. If the manufacturer fails or refuses to comply, the agency may seek enforcement by requesting the United States Attorney General or the appropriate United States Attorney to bring a civil ac-

---

**6.** The decision has not been reported. A copy of the District Court's memorandum opinion appears in the Joint Appendix at 16–28.

**7.** NHTSA Administrator Claybrook's memorandum to Secretary Goldschmidt did not purport

to make a final determination under section 1412(b), and was clearly intended as a recommendation subject to further action by the Secretary.

tion against the manufacturer pursuant to 15 U.S.C. § 1399 and 15 U.S.C. § 1415. In such a civil action the manufacturer is entitled to a trial *de novo* at which the government bears the burden of proving that the subject vehicles contain a defect and that the defect is safety-related. *See United States v. General Motors Corp.*, 171 U.S. App.D.C. 27, 33, 518 F.2d 420, 426 (1975). In a complicated case such as this, the trial and appeal would probably last well over four years and involve huge expenditures of time and money. *See* Affidavit of Lynn L. Bradford, Associate Administrator for Enforcement, NHTSA. (J.A. 335–36) If the Center's argument is sound, then the Secretary could terminate a contested defect investigation only by dropping the case entirely, or mounting a massive litigation campaign, regardless of budget constraints, other priorities, or the strength of the Department's case. We decline to interpret the statute in this way. As this court emphasized in *United States v. General Motors Corp., supra*, the Motor Vehicle Safety Act must be given a commonsense construction. 171 U.S.App.D.C. at 42–43, 518 F.2d at 435–36. We think it unreasonable to assume, in the absence of explicit language, that Congress intended to restrict the Secretary to an "all or nothing" choice between abandoning an investigation or engaging in litigation unlikely to produce worthwhile results.

We therefore hold that in the absence of a final determination of defect pursuant to 15 U.S.C. § 1412(b), the Motor Vehicle Safety Act does not forbid the Secretary to settle a defect investigation on the basis of a remedy other than one listed in 15 U.S.C. § 1414(a)(2)(A).

■ The Center challenges the Secretary's choice of remedy as arbitrary, capricious and an abuse of discretion under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). According to the Center the notification letters and warning labels bear "no semblance to any cure contemplated by NHTSA", ignore "all of the NHTSA record and conclusions" and will be ineffective. The District Court held that a rational basis

existed for the Secretary's settlement, owing to the unique nature of the alleged defect, the "difficult, if not insurmountable, problems of proving that a defect actually existed," and that "most of the roll back incidents could be prevented if drivers merely followed the proposed warning labels." (District Court Op. at 11–12)

We agree that the Secretary did not act arbitrarily or abuse his discretion in reaching the settlement. First, the existence of a defect was not conclusively established. Even after "the largest and most difficult and complex investigation ever conducted by NHTSA," the Associate Administrator for Enforcement of NHTSA, who had been responsible for the Ford transmission investigation, stated "major new investigative efforts" would probably have been necessary to establish that a defect existed. Affidavit of Lynn L. Bradford. He concluded, "I am unable to state whether such additional investigation would have resulted in a final determination that a defect was present." *Id.* (J.A. 334–35) Second, even if a final determination had been reached, Ford would have challenged enforcement of any remedy order. The Department would have faced great difficulties in sustaining its burden to prove the existence of a defect, because the interaction between driver and vehicle seemed a critical factor in the transmission malfunctions. Even if the Department ultimately prevailed, the enforcement action would probably have lasted at least four years during which time approximately six million of the vehicles in question would have been retired from service. Third, the Ford investigation involved an enormous drain on Department resources. At the time of settlement six of the thirty-two ODI staff engineers were working full time on the Ford case; an additional ten engineers were devoting over thirty percent of their time; and "ODI personnel resources were so overtaxed that the conduct of additional safety defects investigations was impaired." Bradford Affidavit ¶ 7. (J.A. 334) In light of all these factors and in particular the uncertainty of success if litigation continued, the Secretary's decision to settle cannot be termed irrational or

arbitrary. Any experienced lawyer can cite cases in which stubborn litigants lost everything when they might have settled for at least part of the relief demanded.

The Center argues that no evidence exists to show the letters and safety labels will be effective, and that the Secretary did not adequately explain his decision. The record shows, however, that many of the reported accidents occurred when an unattended vehicle moved in reverse with its engine running. ODI Phase I Report at 14. Both common sense and the statements of NHTSA officials indicate that the likelihood of such accidents can be substantially reduced if the driver follows instructions by shutting off the engine and setting the parking brake before leaving the vehicle. *See, e.g.*, Bradford Affidavit, *supra*, at ¶ 16. No remedy of course can be absolutely effective. As Administrator Claybrook pointed out in her memorandum to the Secretary, if the vehicles had been recalled experience showed that only about half of them would actually have received the prescribed repairs. Claybrook Memorandum, *supra*, at 1. Moreover as noted in Secretary Allison's letter, the Department continues to monitor the Ford transmission problem and may take additional action if required.

The Secretary's letter explaining the settlement is rather short. However, looking to the full administrative record, the agency's reasons for its action are not so obscure as to frustrate effective judicial review. Appellants' dissatisfaction with the curtness of the Department's written explanation is understandable, considering the expense and magnitude of the administrative proceeding. Nonetheless the law requires no more than what the agency provided. *See Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

The District Court's order granting summary judgment is

*Affirmed.*