UNITED STATES of America,
Appellant,

v.

GENERAL MOTORS
CORPORATION. (Two Cases)

Nos. 87–5170, 87–5235.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 6, 1987.

Decided March 8, 1988.

Douglas Letter, Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., Erika Z. Jones, Chief Counsel, Kenneth N. Weinstein, Deputy Asst. General Counsel, David W. Allen, Asst. Chief Counsel, Enid Rubenstein and Eileen T. Leahy, Nat. Highway Traffic Safety Admin., were on the brief for appellant. William Kanter, Dept. of Justice, Washington, D.C., also entered an appearance, for appellants.

Thomas A. Gottschalk, with whom Frederick M. Rowe and Jeffrey A. Rosen, Washington, D.C., were on the brief, for appellee.

Milton D. Andrews, Lance E. Tunick, Washington, D.C., Charles H. Lockwood, II, Detroit, Mich., and John T. Whattley were on the brief, for amicus curiae, Auto. Importers of America, Inc.

William H. Crabtree, Edward P. Good, Detroit, Mich., Stephen M. Shapiro, Andrew L. Frey and Kenneth S. Geller, Washington, D.C., were on the brief, for amicus curiae, Motor Vehicle Mfrs. Ass'n of the U.S., Inc., et al.

Before EDWARDS, STARR and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

The United States brought this action against General Motors Corporation ("GM") alleging various violations of the National Traffic and Motor Vehicle Safety Act of 1966, as amended, 15 U.S.C. § 1381 *et seq.* (1982) ("the Act") arising out of allegedly defective brakes in GM's 1980 model X-cars. Following a lengthy bench trial, United States District Judge Thomas Penfield Jackson entered judgment for GM.

We hold that, under the particular circumstances of this case, the Government failed to meet its burden of demonstrating a class-wide defect and therefore affirm.

## I

The District Court set forth the facts of the case in a reported opinion, *United States v. General Motors Corp.*, 656 F.Supp. 1555 (D.D.C.1987). Judge Jackson's thorough and careful recitation will be generously relied upon here.

## A

GM began developing the X-car in 1975. During the developmental phase, GM personnel subjected various models of the X-car to durability testing. In 1978, GM's engineering staff subjected model X-cars to a new, and particularly abusive, durability test. Drivers in these tests registered complaints of "premature" rear-wheel lock-ups, a phenomenon which we shall presently describe in detail. *See* Part III, *infra.* GM engineers investigated these com-

plaints and concluded that the incidents were single rear-wheel lock-ups.

In mid-December 1978, GM formed a special task force to examine the X-car's brake system. A few weeks later, the task force recommended against delaying production of the X-car, but suggested a number of design changes to the brake system. Specifically, the task force recommended changes in three component parts of the rear-brake assembly: (1) replacement of existing rear brake linings with "less aggressive" linings in automatic transmission vehicles; (2) use of a "finned" drum in place of a "smooth" drum; and (3) a change from a 41% proportioning valve to a 27% valve.[1] These changes were phased in as the car went into production in 1979; as a result, GM produced 1980 model X-cars with several different brake configurations.[2]

The National Highway and Traffic Safety Agency ("NHTSA") opened a formal investigation of the X-car's braking system in July 1981. This investigation was prompted by an unusually high number of consumer complaints about rear-wheel lock-up. In July 1981, GM voluntarily agreed to recall 47,371 *manual* transmission X-cars equipped with the original 41% proportioning valve. *See supra* note 2. The manufacturer replaced the valves on those cars with the 27% proportioning valve, *see supra* note 1; therefore, the only X-cars left on the road fitted with the 41% proportioning valve were automatic transmission vehicles. In voluntarily taking this

remedial action, however, GM did not concede the existence of a defect.

Meanwhile, NHTSA continued its investigation into the X-car. In January 1983, the agency issued an initial determination that all 1980 X-cars with the more aggressive rear-brake linings—both manuals and automatics—had a safety defect. NHTSA did not hide its candle under a bushel; to the contrary, the agency's defect determination was accompanied by widespread publicity. Of especial relevance in this case, NHTSA released to the television networks a film-clip showing an X-car spinning out of control; this film-clip, featured prominently on the nightly news, was viewed by an estimated 53 million viewers. Faced with NHTSA's action and the concomitant publicity, GM promptly agreed voluntarily to recall all 1980 X-cars equipped with manual transmissions and certain of its early-production cars with automatic transmissions.

In March 1983, NHTSA favored GM with a request for production of documents, requiring the manufacturer to produce all internal documents relating to the problem of premature rear-wheel lock-up. In the ensuing document production, NHTSA obtained copies of certain documents, prepared during X-car preproduction testing, that expressed concerns within the bowels of GM's bureaucracy about the X-car's lock-up problem. Based on the consumer complaints and GM's documents, NHTSA referred the matter to the Department of Justice, which filed the complaint in this action in August 1983.

---

1. Proportioning valves limit the hydraulic pressure going to the rear brakes when brakes are applied in medium to heavy braking situations. Thus, the change to a 27% apportioning valve was designed to decrease the rear braking force, relative to the front brakes, at higher decelerations. The two other changes were made to improve the rear brake temperature. 656 F.Supp. at 1562.

2. The changes were introduced at various stages of production:

GM changed the lining on automatic transmission cars starting in March 1979. GM produced nearly 32,000 automatic transmission cars with the original linings; the remainder were equipped with the new, "less aggressive," combination. A change in lining for manual transmission cars was made only toward the end of the model year after GM redesigned the

X-car's parking brake system, allowing it to use less aggressive linings on even manual transmission X-cars and still be able to pass NHTSA regulations governing parking brake grip. By that time, over 200,000 manual transmission X-cars had been produced with their original linings.

The change in drum configuration went into effect on August 15, 1979. By that time, 278,000 cars had been built with the smooth configuration.

The proportioning valve was changed in production beginning on August 27, 1979. Up to that point, 246,000 automatic transmission vehicles and 47,000 manual transmission vehicles had been produced with the 41% proportioning valve. *See* 656 F.Supp. at 1562, 1571 n. 34, 1572 n. 35, J.A. at 647.

We pause in our narrative to observe that in all previously reported recall cases NHTSA first determined, through the administrative procedures specified in 15 U.S.C. § 1412, that a defect in fact existed in the vehicle in question.[3] Upon conclusion of the administrative proceedings, NHTSA then and only then brought actions to obtain enforcement of its orders. In this case, however, NHTSA followed a unique course; the agency proceeded directly to court without completing the administrative process. Although GM argued before Judge Jackson that the Act *requires* NHTSA to complete its administrative proceedings before repairing to court, the trial court rejected this contention, *United States v. General Motors Corp.*, 574 F.Supp. 1047, 1048-49 (D.D.C.1983), and GM has not renewed it on appeal.

### B

NHTSA's complaint alleged, in brief, that GM's 1980 model X-cars were defective because the rear wheels of the vehicle were predisposed to lock up prematurely upon the driver's application of the brakes. Count I charged that, prior to the X-car's production, GM either determined or should have determined "that the rear braking system, for reasons relating to several distinct components of that system, caused premature rear wheel lock-up, with consequent loss of vehicle control." Complaint at 26, Joint Appendix ("J.A.") at 67. Count II alleged that this condition was aggravated by excessive corrosion, over time, of the front braking components. As to both counts, NHTSA alleged that GM violated the Act by failing to notify the Secretary and remedy the defect. Counts III and IV charged that GM's limited recalls in 1981 and 1983 with respect to some 1980 model X-cars were inadequate.[4] Count IV asserted that GM failed to include NHTSA's "hotline" telephone number in one of its prior recall notices, in violation of a NHTSA regulation, 49 C.F.R. § 577.5(g)(1)(vii) (1981). The Government sought injunctive, declaratory, and monetary relief, including an order directing GM to recall and repair all of its 1980 X-cars.

Trial began in March 1984. The evidentiary record, consisting of testimony from 33 witnesses, 16,291 pages of transcript and 3,694 exhibits, was closed over a year later in May 1985. The trial itself consumed 113 court days. In a meticulous opinion, Judge Jackson rendered his decision in favor of GM in April 1987. The United States then brought this appeal.

### II

The legal framework governing our inquiry can be briefly stated. Congress enacted the National Traffic and Motor Vehicle Safety Act of 1966 for the purpose of "reduc[ing] traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381 (1982). Section 1411 under which the United States brought Counts I and II of the complaint, requires a manufacturer which obtains knowledge of a safety-related defect in its motor vehicles to notify the Secretary of Transportation and to remedy the defect in accordance with procedures set forth at section 1414.[5] Section 1412 confers authority on the Secretary to order a manufacturer to remedy a safety-related defect upon the Secretary's determination, in accordance with prescribed administrative procedures, that a defect exists. Under section 1399, jurisdiction is vested in federal dis-

---

**3.** 15 U.S.C. § 1412(a) provides that, upon an initial determination by the Secretary that a motor vehicle fails to comply with federal safety standards or contains a defect, the Secretary must give notice and an opportunity to respond to the manufacturer and the public. 15 U.S.C. § 1412(b) confers authority on the Secretary to enforce a final defect or safety-standard determination. *See infra* p. 403 & n. 5.

**4.** Count V of the complaint alleged that, during NHTSA's investigation, GM provided misleading and incomplete information in response to the Government's requests for information. On February 6, 1984, the District Court granted GM's motion to sever Count V for separate trial. 656 F.Supp. at 1558 n. 2. This count has not yet been tried. Brief for the United States at 3 n. 3.

**5.** Section 1414 requires the manufacturer to remedy the defect by repairing the vehicle, replacing it, or refunding the purchase price less depreciation. The manufacturer is free to choose among the three options.

trict courts to restrain violations of the Act.

Section 1391 defines the term "defect." The definition is, unfortunately, circular. Section 1391 states broadly that the term "defect" includes "any defect in performance, construction, components, or materials in motor vehicles or motor vehicle equipment." 15 U.S.C. § 1391(11) (1982). Happily, two decisions of this court have furnished that pivotal term with more specific content. *See United States v. General Motors Corp.*, 518 F.2d 420 (D.C.Cir. 1975) (*"Wheels"*); *United States v. General Motors Corp.*, 561 F.2d 923 (D.C.Cir. 1977) *cert. denied* 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978) (*"Pitman Arms"*).

*Wheels*

At issue in *Wheels* were alleged defects in pickup trucks that caused broken wheels. In that suit, GM acknowledged that the wheels were indeed breaking, but contended that NHTSA had failed to carry its burden of showing that the failures did not result from owner misuse. Writing for the court, Judge Leventhal stated that NHTSA was entitled to a presumption that "such failures occurred under conditions of operation that were either within the parameters specified by the manufacturer or reflect ... ordinary abuse...." 518 F.2d at 438. The manufacturer could rebut this presumption, the *Wheels* court indicated, by establishing "as an affirmative defense, that the failures were attributable to gross and unforeseeable owner abuse or unforeseeable neglect of vehicle maintenance." *Id.*

In the course of its decision, the court held that "a vehicle or component 'contains a defect' if it is subject to a significant number of failures in normal operation...." *Id.* at 427. The court went on to explain that "significant number of failures" meant a number of failures that is "non-*de minimus* [sic]." *Id.* at 438 n. 84.

With respect to the type of proof necessary for the Government to sustain its burden, Judge Leventhal observed that "a determination of 'defect' does not require any predicate of a finding identifying engineer-

ing, metallurgical, or manufacturing failures. A determination of 'defect' may be based exclusively on the performance record of the vehicle or component." *Id.* at 432.

*Pitman Arms*

In *Pitman Arms*, the manufacturer (once again GM) conceded the existence of a defect in certain components of the steering mechanism (known in the industry as "pitman arms") in Cadillacs. GM contended, however, that the failure occurred only in low-speed, high-stress maneuvers (*e.g.*, parallel parking) and therefore did not pose an unreasonable risk to safety. The court held that, under the circumstances of the case, NHTSA had demonstrated that the failures constituted an unreasonable risk and was therefore entitled to summary judgment. The court pointed to uncontradicted facts that the failures occurred while the cars were in operation and that in such situations the driver inevitably lost control of the car. Judge Leventhal wrote a lengthy opinion, concurring in part and dissenting in part (much of which the majority stated it agreed with), setting forth his view that GM should have been given "the opportunity to show that the failures occur in circumstances in which loss of steering is not dangerous." 561 F.2d at 930.

### III

With the benefit of this statutory and decisional background, we return to the case at hand. But before treating the evidence adduced by the parties at trial, we shall take a brief detour, as did the District Court, to examine as best we can the mechanics of automobile braking systems. *See generally* 656 F.Supp. 1562–66. To understand the nature of the alleged defect here, namely "premature rear-wheel lock-up," it will be helpful to break down each of these terms.

### A

*"Lock-up."* In this context, "lock-up" refers not to incarceration but to what is colloquially known as skidding. As practically every veteran of car rides knows,

skidding occurs when a wheel (or wheels) of an automobile lock up and slide across the surface of the road. In these unpleasant circumstances, the wheel (or wheels) do not rotate as drivers come to expect their wheels to do. We are told that wheels typically "lock up" when the driver applies the brakes sufficiently hard so that the braking force at the tire exceeds the limit of adhesion created by the friction between the tire and the road.[6] The same amount of braking force is more likely to cause skidding on a slippery surface, because in those circumstances the coefficient of friction between the tire and the road is lower.

Skidding results, unhappily for driver and passengers, in a loss of control over the automobile for two rather straightforward reasons: (1) steering is ineffective while the tire is locked up; and (2) a sliding tire requires more time to slow down than a tire that is in its customary role of rotating. But, as the District Court noted and the Government concedes[7]

> [skidding (or wheel lock-up) alone] does not represent a systemic mechanical malfunction, or a broken or failed part. Brake lockup can occur, and the locked wheel will skid, notwithstanding the brake system and all its components are performing precisely as intended, simply because the driver has applied the brakes with too much force relative to extant tire and road conditions.

*Id.* at 1563 (footnote omitted).

*"Rear-wheel lock-up."* "Rear-wheel lock-up" refers to the situation in which the rear wheels of the automobile both lock up before either of the front wheels do. This unsettling condition commonly results in what is colloquially referred to as "fishtailing" or "spin-out"; those versed in such matters use the more proper term, "yaw" or "yawing." "Front-wheel lock-up" refers, as might be guessed, to the converse situation in which both front wheels lock

up before either of the rear wheels do. It is in this context that the cognoscenti employ the term "bias" to refer to the car's propensity to lock up in a certain sequence when the brakes are applied sufficiently hard to cause all four wheels to lock up. A car that locks its rear wheels first is said to be "rear biased." The alert reader will already have guessed that a car that locks its front wheels first is said to be "front biased."

Rear-wheel lock-up produces consequences different from those resulting from its front-wheel counterpart. A car gripped in the throes of front-wheel lock-up will require longer to stop than a car in rear-wheel lock-up; on the other hand, the front-biased car is generally more stable than its rear-wheel counterpart. Conversely, if a significant lateral force is exerted on it, a car in a rear-wheel lock-up will rotate around its vertical axis—that is "yaw" or "fishtail." Thus, a rear-biased car is more apt to "fishtail" or "spin-out" than one that is front biased; however, a rear-biased car requires less distance to stop. Like much else in life, there are trade-offs in the world of automobile "bias."

An ideal brake balance is one in which all four wheels lock up simultaneously; this means that maximum braking force can be applied at each wheel—resulting in shorter stopping distances—before any single wheel locks up. However, as the District Court observed, inasmuch as the ideal balance changes with each deceleration (and even *during* a single deceleration) and with the changing load characteristics of each car, "ideal balance can never be achieved by any brake design throughout the entire range of operating and loading conditions to which a car is subjected." *Id.* at 1564. In short, brake systems are less than ideal.

---

6. The limit of adhesion is, we gather, expressed in terms of what the experts call the coefficient of friction ($\mu$ between the road and the tire. As the District Court explained this point, "[t]he 'coefficient of friction' is a mathematical calculation, $\mu = F/N$, where F is the force required to slide one object over another and N is the vertial, or 'normal' force, perpendicular to it."

656 F.Supp. at 1562 n. 16. Fortunately, we have no occasion to question Judge Jackson's elaboration of what is, for us, a rather arcane, highly technical point.

7. *See* Reply Brief for the United States at 2; Transcript of Oral Argument at 16.

As with skidding, the fact that a car is rear biased does not, by itself, suggest the existence of a defect. As the District Court stated (and the Government appears to concede), "[i]n the United States minimum stopping distance has historically prevailed over stability as the paramount objective of effective braking." *Id.* at 1566–67. The emphasis is on stopping the car quickly, at the expense of stability. Indeed, by focusing on stopping distance without prescribing a lock-up sequence, NHTSA's own regulations implicitly encourage rear bias design. *See* Federal Motor Vehicle Safety Standard ("FMVSS") 105–75, 49 C.F.R. § 571.105 (1986).[8] The District Court found that testing by both GM and NHTSA in this case showed that "a substantial percentage of cars in service in America between 1977 and 1984 had some degree of rear bias and were intentionally so designed...." 656 F.Supp. at 1567 n. 30.

*"Prematurity."* Finally, in claiming that the 1980 X-cars *prematurely* lock up, NHTSA contends, in essence, that the cars skid under circumstances in which a driver would not reasonably anticipate. Put slightly more technically, the wheels lock up before the driver would ordinarily expect them to, in view of the level of braking force applied, the condition of the road, and other driving variables. The term thus "expresses a subjective judgment of the driver as to when he might expect his wheels ... to lock up" in any particular application of the brakes. *Id.* at 1565 n. 24.

### B

The problem of prematurity lies at the heart of this case. As we have seen, neither lock-up *per se* nor lock-up caused by the rear wheels of the automobile is, in and of itself, indicative of a defect. On this all are congenially in accord. The parties are in further agreement that skidding alone,

even when accompanied by fishtailing, does not signify a defect in the automobile. *See* Reply Brief for the United States at 2; Transcript of Oral Argument at 16. To state what should by now be evident even to dedicated users of public transportation, cars skid if there is a certain convergence of factors. Slamming the brakes hard while driving on a wet road provides the paradigm example from common experience. As the District Court more articulately explained, "[s]kidding results from the interaction of the driver, the brake system, and the tire/road interface.... [S]kidding *in and of itself* is not a failure of vehicle 'performance' nor indicative of a brake 'defect.' " 656 F.Supp. at 1563 (emphasis in original).

It should therefore be apparent that it is not skidding, without more, that this case is all about. Rather, as the Government argues, it is the alleged prematurity of the wheel lock-up that (if true) renders the X-car defective within the meaning of the Act.

Thus, in alleging that the 1980 X-cars were defective by virtue of their propensity to experience "premature rear-wheel lock-up," NHTSA asserted a type of defect that, by its terms, included concepts of causation (skidding or lock-up caused by *rear* wheels) and consumer expectations (skidding or lock-up that was *premature*). We are thus in a considerably more complex legal environment than was the court in either *Wheels* or *Pitman Arms*.

### IV

In seeking to carry its burden of showing a class-wide defect, the Government adduced two sorts of evidence at trial. First, NHTSA relied heavily on evidence from consumers describing their personal experiences of skidding and loss of control with the X-car. Second, NHTSA sought to cor-

---

**8.** Shortly before the conclusion of trial, NHTSA published a notice of proposed rulemaking to consider a new braking standard to replace FMVSS–105. 50 Fed.Reg. 19744 (May 10, 1985). The new standard would have the consequence of specifying lock-up sequence: "In practical terms, [the proposed performance require-

ments] mean[ ] that if a driver applie[s] the brakes hard enough to get wheel lockup, the front brakes would be the first to lock." 50 Fed.Reg. at 19747. NHTSA published a supplemental notice of proposed rulemaking on January 14, 1987, revising its initial proposal. *See* 52 Fed.Reg. 1474.

roborate the consumer testimony with GM's internal documents.

## A

The Government's case primarily featured complaints from consumers about their unfavorable experiences on the road. NHTSA claimed that, as of February 1985 (almost a year after trial began), it had received over 4,000 complaints that the agency was "prepared to classify officially as cases of 'probable premature rear brake lockup.' " *Id.* at 1569. In the aggregate, NHTSA asserted, the complaints revealed a "performance defect" in the braking system of the 1980 X-cars in sufficient numbers to infer the existence of a class-wide defect under the standards elucidated in *Wheels.*

The Government drew on consumer complaints from the following sources: (1) live testimony from twelve X-car drivers who had encountered various incidents of skidding accompanied by fishtailing or spinout; (2) depositions of forty-one other X-car drivers describing similar incidents; and (3) unsolicited written reports from still more drivers complaining about the same phenomenon.

The Government's case opened with the twelve consumer-witnesses. These witnesses were drawn from a variety of locales, age groups, and occupations. All were seasoned veterans behind the wheel. The incidents about which they testified occurred in diverse weather conditions, "ranging from heavy snow [to] dry summer heat." *Id.* at 1570. *But see infra* note 14. Each witness testified about fishtailing or spinout incidents in angles ranging from 30° to 180° from the car's original heading. The District Court described this phenomenon as "a 'yaw,' or swerve by the rear to a marked degree, either left or right, from the axis of travel upon the application of 'moderate' to 'moderately hard' brake pressure, while traveling at relatively modest rates of speed." 656 F.Supp. at 1570. Each of the twelve witnesses had suffered through more than one such dyspeptic experience, some as many

as six, which occurred intermittently and without warning.

Moreover, each witness thought the events unusual in that "[n]one of them had ever experienced the phenomenon to which they testified in any other vehicles they had driven in all their years of driving." *Id.* In addition, "[a]ll professed to be able to distinguish it from control difficulties associated with ice or snow." *Id.* The Government supplemented the in-court testimony by introducing depositions describing similar incidents from forty-one other GM customers.

The Government also relied upon unsolicited consumer complaints about skidding incidents, which were sent directly to GM or NHTSA. Dr. Howell K. Brewer, Chief of NHTSA's Vehicle Dynamics and Simulations Group, analyzed a sample of 109 declarations obtained by the Government from among over 2,000 complaints that NHTSA represented it had in hand at the time. Dr. Brewer classified as "consistent with" rear-wheel lock-up incidents that indicated braking accompanied by a large yawing motion. Tr. 4602–03, J.A. at 1410–11. Of the 109 declarations, Dr. Brewer found three-fourths of them "consistent with" rear-wheel lock-up. Following Dr. Brewer's testimony, the Government called a statistician, who testified that it could reasonably be inferred from the foregoing sampling that 1,400 of the over 2,000 complaints were "consistent with" rear-wheel lock-up.

By virtue of this evidence, the District Court assumed that all of these consumers "would have given similar testimony if called." 656 F.Supp. at 1570. Thus, the District Court appeared to rule that, in the aggregate, over 1,400 GM customers (and perhaps as many as 3,000) had experienced incidents of "yaw" similar to that about which the twelve in-court witnesses had testified.

This, the Government argued, sustained its burden under *Wheels* of demonstrating a non-*de minimis* number of performance failures; in the Government's view, this showing warranted the inference of a class-wide defect in the X-car's braking system.

**B**

The Government sought to corroborate this consumer-complaint evidence with internal GM documents. In particular, the Government pointed to the results of GM durability tests during the X-car's preproduction phase. At a meeting of top management officials in December 1978, GM executives were informed that "the testing had revealed, among other design 'deficiencies,' a problem with 'rear brake lockup' which remained 'unresolved' despite efforts to correct it." *Id.* at 1571. In the wake of this report, GM formed a task force to determine whether to delay production and to propose solutions for the "lockup problem." In late January 1979, the task force recommended against delay of production, notwithstanding the fact that no explanation for the problem had been found and testing remained incomplete. At the same time, however, the task force recommended the various design changes which we recounted earlier, *see* Part I.A, *supra,* some of which were eventually adopted. *Id.*[9]

After production began, GM continued to conduct durability testing, and test drivers continued to report incidents of brake lockup.[10] After X-cars found their way into showrooms beginning in April 1979, GM began to receive customer complaints that NHTSA characterized as "consistent with" rear-wheel lock-up. GM found that certain of the brake configurations on X-cars caused more customer complaints than others. That is, more aggressive braking systems caused the lion's share of the reported problems. GM's records showed that brakes equipped with 27% proportioning valves, less aggressive rear linings, and finned drums generated the fewest complaints.

**V**

Upon completion of the Government's *prima facie* case, and the District Court's denial of GM's motion to dismiss pursuant to Fed.R.Civ.P. 41(b), GM put on its defense. After GM's case, the Government followed with rebuttal evidence; the trial concluded with surrebuttal from GM. In these phases of the trial, both sides presented extensive evidence of actual tests conducted on GM X-cars and engineering analyses of data generated from those tests. In its defense, to which we now turn, GM relied in the main upon two types of evidence: brake testing data and accident statistics.

**A**

GM's defense was grounded substantially upon extensive testing data comparing the braking performance of X-cars with vehicles of other manufacturers. Both NHTSA and GM measured the tendency toward rear bias of numerous X-cars, including several that were the subject of consumer complaints, and compared these measurements with those of comparable vehicles. The test results were uniformly favorable to GM.[11] Despite enormous ef-

---

**9.** GM insisted at trial, and continues to insist on appeal, that it assessed all preproduction incidents of premature rear-wheel lock-up as instances of "'one-wheel takeovers,' *i.e.,* a *single* rear brake generating a significantly disproportionate amount of brake torque relative to the other, attributed to sustained exposure to high operating temperatures...." 656 F.Supp. at 1561 n. 12. The District Court observed that the GM engineers' conclusions in this respect were buttressed "by the discovery of unilateral glazed or cracked linings ... found only on the offending wheel." *Id.* at 1561 (footnote omitted).

**10.** At one staff meeting, a GM senior vice president of engineering exclaimed:

Don't you know that you never lock the rear wheel brakes first?!!

How are such product decisions made?

What event caused the design responsible division to change their mind on this matter?

How can GM put out such a system?

Engineering Staff is not doing its job!

656 F.Supp. at 1571, J.A. at 391.

The Government, understandably, makes much of this; nonetheless, GM's senior vice president appears to have fallen into engineering error in asserting that braking systems are never designed to permit the rear wheels to lock first. *See* p. 406, *supra* and 416, *infra.*

**11.** The District Court described the testing program as follows:

General Motors measured the brake balance of 73 "current configuration" X-cars, 24 of which had been the subjects of consumer complaints. NHTSA measured the brake balance of 30 X-cars (including later models),

fort, not a single test was able to identify *any* physical engineering cause to account for premature rear wheel lock-up in X-cars; nor, for that matter, was any test successful in replicating in controlled circumstances the sorts of incidents about which various consumers had complained.

Overall, GM and NHTSA tested 302 "as received" X-cars and 528 "peer" cars. *Id.* at 1572 n. 38. The District Court found these test results to be "the most objective, least ambiguous or equivocal, and hence the most convincing evidence adduced." *Id.* at 1572. The court stated that this evidence "is the primary basis for this decision." *Id.* Judge Jackson summarized the evidence as follows:

> The results of the test program were definitively consistent, regardless of which party conducted the tests and recorded the data, or the manner in which the test cars were obtained. *The results conclusively disprove the existence of any common engineering idiosyncracy in the braking performance of 1980 X-cars not found in their competitors....*

*Id.* at 1573 (emphasis added). The District Court made a number of subsidiary findings of fact based on these test results, all in support of its conclusion that the X-car brakes performed as well as or better than those of GM's competitors.

### B

In addition to test results, GM introduced a "risk analysis" based on the relative rates of accident involvement of X-cars and other vehicles drawn from NHTSA records and data produced by state agencies. These studies showed that X-cars had lower rates of accident involvement than various models of competitors. The Govern-

ment did not challenge the risk analysis itself, but argued that a relatively rare problem, such as the rear-wheel lock-up at issue here, would be masked in bottom-line accident figures, since driver error is the most common cause of accidents.

### VI

As the Government's brief points out, "[d]espite the length of the opinion, the district court's legal analysis is actually short, and reduces to two reasons why it ruled against the government." Brief for the United States at 12.

First, Judge Jackson held that to show a defect under the Act the Government must demonstrate that *"failures* had occurred, not merely that consumers had complained." 656 F.Supp. at 1577. The District Court reasoned that "anecdotal accounts of skidding events are not sufficiently reliable, *i.e.,* are not competent evidence from which to infer the existence of any specific brake problem." *Id.* In the Court's view, "[d]rivers can describe only what happened to them, which is an altogether insufficient basis upon which to make a judgment as to the technical adequacy of the braking system of their cars, especially when, as here, the testimony is of skidding incidents which occurred sporadically months or years apart." *Id.*

Second, as an alternative holding, the District Court concluded that, even if the Government had demonstrated the existence of a defect, it had not sustained its burden to show that the X-car presented "an unreasonable risk of accidents or injuries." *Id.* at 1578 (citing 15 U.S.C. §§ 1391(1), 1411; *Wheels,* 518 F.2d at 426, 435). The District Court assessed the "reasonableness" of the risk to safety in terms

three of which were complaint vehicles. NHTSA also determined the wheel lock sequence of more than 140 additional current configuration X-cars, without, however, measuring their brake balances. Then, in order to compare the X-car measurements to some external standard, both parties also tested a number of competitive, or "peer," cars.... GM initially tested 57 competitive vehicles.... Then, reacting to NHTSA's intimations that the competitors might not be fairly representative, GM tested an additional 97

cars from particular model lines, and a statistically random sample of 101 other competitive cars.... NHTSA evaluated 41 competitive cars for wheel lock sequences, but did not measure the brake balance of any.

656 F.Supp. at 1572–73.

"Current configuration" refers to X-cars equipped with any combination of front and rear brake linings, proportioning valves, and rear brake drums remaining on the road after GM's two recalls.

of "(1) the severity of the harm it threatens; (2) the frequency with which that harm occurs in the threatened population relative to its incidence in the general population; and (3) the economic, social, and safety consequences of reducing the risk to a so-called 'reasonable' level." *Id.* As to severity of harm, the trial court appeared to assume that the only way to correct for rear-wheel lock-up was to increase the likelihood of front-wheel lock-up; the court concluded in that regard that "the risk of loss of control with rear brake lockup may or may not be more severe than the consequences of a front brake lockup." *Id.* at 1579. With respect to frequency, the District Court found that "GM's risk analysis evidence demonstrates that the likelihood of involvement in a skidding accident is no higher, and as a rule lower, for the 1980 X-car population at large." *Id.* The District Court reasoned that any remedy for rear-wheel lock-up would necessarily make the car more front biased and that this design trade-off would "actually move the cars farther from the ideal in all loading conditions, the result being, as previously noted, to render them prone to earlier front lock, skidding incidents with longer stopping distances, and the control losses associated with front skids." *Id.* at 1580.

Based on its conclusion that the Government had failed to show that the 1980 model X-cars present an "unreasonable risk" of accidents due to a "defect" that causes "premature rear-wheel lock-up," the District Court dismissed Counts I and II of the complaint. By virtue of the finding of a lack of a defect, Judge Jackson dismissed Counts III and IV as well.

Finally, the District Court dismissed Count VI of the complaint, which it may be recalled alleged that GM had failed to notify customers of NHTSA's "hotline" number in notices accompanying two earlier GM recalls. Judge Jackson concluded that, inasmuch as the Government had not shown that the X-cars were defective, "GM was legally a volunteer in making both recalls, and that neither notification was, therefore, required to conform to any particular form." *Id.* at 1581.

## VII

On appeal, the Government complains that several errors infect the District Court's judgment. First, the Government challenges the District Court's treatment of the consumer complaints, arguing that Judge Jackson held them insufficient, as a matter of law, to establish the existence of a defect. Second, the Government contends that, both as a matter of law and under the particular facts of this case, the District Court incorrectly relied on the engineering data developed in the course of this litigation. Finally, the Government asserts error in the District Court's holding that GM's 1981 and 1983 recalls were adequate; this is so, the Government contends, even if the District Court was correct in finding no defect in current configuration X-cars.[12]

---

**12.** The Government also challenges the District Court's alternative holding that, even if the 1980 X-car has a braking defect, it does not fall within GM's statutory obligation to remedy. By virtue of our disposition, we need not reach, and express no opinion on, the District Court's alternative holding. The parties are in deep disagreement as to the appropriateness of GM's reliance on accident statistics to show that the defect, if any, in the X-car's braking system is not safety-related. NHTSA argues that because incidents of rear-wheel lock-up are relatively rare, such incidents would not show up in overall accident data. Such incidents, NHTSA maintains, would be overwhelmed by the "vastly greater number of accidents for which 'driver error' is responsible." 656 F.Supp. at 1575. These are substantial arguments which we leave to another day.

Aside from its relevance to the requirement that any defect be "safey related," the Government contends that the District Court relied on the accident statistics—albeit to a lesser extent than it did on the test data—to reach its finding of an absence of a defect. Such reliance, the Government argues, was misplaced for the same reasons noted in the preceding paragraph. NHTSA made the identical argument to Judge Jackson; fairly read, however, the District Court's opinion took full cognizance of these concerns. The court simply noted that accident statistics—"to the extent that [they could] prove specific events" at all—were more consistent with the "absence, not the presence, of a 'safety-related defect' in the X-car." *Id.*

## A

NHTSA does not directly quarrel with the proposition that reports of skidding, standing alone, do not necessarily show that a car is defective.[13] To draw the critical inference that such incidents are the result of a defect in the vehicle, the Government relies, as we understand it, on two distinct lines of argument. First, the Government seeks to show that lock-up occurred under conditions in which the driver ordinarily would not have expected to encounter it. Such evidence alone can be relied upon to show that the cars are defective, the Government argues, because of the Act's emphasis on real-world performance. By this reasoning, the *relative* rate of complaint about the X-car in comparison to other vehicles is irrelevant. It is enough to show that the X-car's performance is inconsistent with consumer expectations. Alternatively, the Government seeks to draw a link between aberrant performance and vehicle defect by showing that complaints about this phenomenon were unusually numerous compared to other automobiles. Under this analysis, the District Court should have inferred that the vehicle itself, rather than other factors, was responsible for the skidding incidents because the X-car generated a *disproportionate* number of such complaints.

### 1

For its principal line of attack, the Government argues that the District Court's handling of the consumer-complaint evidence was wrong as a matter of law. The Government sees tension between the District Court's acceptance of the truth of the representative consumer testimony and its ultimate conclusion that consumer complaints were legally insufficient to demonstrate a defect. In accepting the truth of the consumer complaints, the Government argues, the District Court acknowledged that thousands of drivers had experienced unusual incidents of rear-wheel lock-up such as that testified to by the twelve

in-court witnesses. The Government urges that this evidence—and the court's crediting of it—was sufficient to establish the existence of a defect under the Act.

For this proposition, the Government relies primarily on *Wheels* and *Pitman Arms*. The Government emphasizes language in *Wheels*, which we quoted earlier, that "a determination of 'defect' does not require any predicate of a finding identifying engineering, metallurgical, or manufacturing failures. A determination of "defect" may be based exclusively on the *performance record* of the vehicle or component." 518 F.2d at 432 (emphasis added). The Government urges that we draw two points from *Wheels:* first, *Wheels* shows that *performance* of the vehicle, standing alone, can demonstrate a defect; and second, *Wheels* evidences paramount concern for the real-world performance of automobiles in the hands of the consumers. In declining to find a defect in the face of what NHTSA deems overwhelming evidence of performance failure, the District Court held, as the Government sees it, that NHTSA is in effect obliged "actually [to] hand GM a cracked or broken part from its X-car with an explanation for the problem." Brief for the United States at 27.

■ We read Judge Jackson's opinion differently. As the District Court was at pains to point out, the Government must demonstrate that *"failures* had occurred, not merely that consumers had complained." 656 F.Supp. at 1577. To be sure, both *Wheels* and *Pitman Arms* interpret the Act as evidencing Congress' concern with the real-world performance of automobiles in the hands of consumers. Judge Leventhal put it is this way in *Wheels:* "Congress was concerned with the day-to-day performance of motor vehicles in the myriad conditions of use experienced by the public, not the test data compiled by professional drivers on the manufacturer's proving grounds or performance specifica-

**13.** As the District Court pointed out, numerous courts have expressed doubt that skidding alone is probative of a defective vehicle. *See, e.g., Zidek v. General Motors Corp.,* 66 Ill.App.3d 982, 23 Ill.Dec. 715, 384 N.E.2d 509 (1978); *Woods v. General Motors Corp.,* 423 So.2d 112 (La.Ct.App. 1982); *Provence v. Williams,* 62 Tenn.App. 371, 462 S.W.2d 885, 887–88 (1970).

tions under laboratory conditions." 518 F.2d at 434.

But our cases do not suggest that a vehicle may be found defective under the Act regardless of whether vehicle, driver, or roadway is responsible. In contrast to either *Wheels* or *Pitman Arms, NHTSA relies principally here on driving events for which there is no physical or engineering evidence of failure and, critically, which are frequently caused by driver error, environmental factors, some combination of the two, or by other factors.*

NHTSA itself has previously recognized this pivotal difference. In *Center for Auto Safety, Inc. v. Lewis,* 685 F.2d 656 (D.C. Cir.1982) (*"Transmissions"*), plaintiffs challenged NHTSA's settlement of a safety-defect investigation prompted by complaints that Ford automatic transmissions slipped from park into reverse gear. *Id.* at 657. NHTSA had issued an initial defect determination upon finding that "the failure rate in Ford vehicles [involving such incidents] was much greater than the rate in other vehicles, and that the large difference was the result of unique Ford characteristics." *Id.* at 660. NHTSA claimed to have received over 23,000 reports of such incidents in Ford vehicles—almost six times the number of complaints NHTSA claims to have received here. *Id.* Nevertheless, the agency ultimately settled the case without requiring a recall because of "the unique nature of the alleged defect" and the " 'difficult, if not insurmountable problems of proving that a defect actually existed.' " *Id.* at 663 (quoting the District Court opinion). This court upheld the settlement, noting, among other reasons, that "[t]he Department would have faced great difficulties in sustaining its burden to prove the existence of a defect, because the interaction between driver and vehicle seemed a critical factor in the transmission malfunctions." *Id. See* Brief for the Motor Vehicle Manufacturers Association of the United States, Inc., and the Product Liability Advisory Council, Inc., as Amici Curiae at 31–32.

■ To find a "defect" within the meaning of the Act, then, NHTSA must show that the vehicle itself is defective—whether this defect manifests itself in the performance, construction, components, or materials of the automobile. In this case, it was NHTSA's burden to show not only that X-cars experienced incidents of skidding and spinout—rear-wheel lock-up—but that these were incidents of *premature* skidding and spinout. That is to say, NHTSA was obliged to demonstrate that the incidents occurred under circumstances in which, absent a defect, they would not have occurred.

As we have seen, both sides acknowledge that cars skid for a variety of reasons. And it is this variety of possible explanations for incidents of skidding that is critical to this case. As the District Court pointed out, the evidence "conclusively establishe[d] that skid-and-yaw can and does result from, in addition to brake imbalance, differential road friction, road camber or slope, curved paths of travel, worn, under-inflated, or mismatched tires, driver steering inputs, combined braking and cornering, and lane change maneuvers, for none of which the car's braking system can be held responsible." 656 F.Supp. at 1578.

We recognize, as the Government emphasizes, that the drivers themselves may have thought the events which they experienced were unusual. But we agree with the District Court that the drivers were in no position to know if the rear-wheel lock-up was, in fact, premature in view of the particular braking application and driving parameters involved in each incident.[14] In stating that consumer-complaint evidence was not "competent" in this case, the District Court rendered what we see as a fact-specific (and therefore narrow) ruling that, under the particular circumstances of this case, consumers were not capable of discerning whether what they experienced was an incidence of *premature* rear-wheel lock-up. The simple point is this: drivers cannot assess with reasonable accuracy the external variables that may contribute to a

---

**14.** In fact, 82.5% of the reported skids were on wet, snowy, or icy roads. J.A. at 556.

skid, no matter how rich their experience or concentrated their attention may be.

We hasten to add that we by no means suggest, much less hold, that consumer-complaint evidence alone can never suffice to make out a *prima facie* case establishing the existence of a defect.[15] Nor do we, as the Government complains of the District Court's decision, place on NHTSA the burden to provide an *engineering explanation* for a vehicle's failure in performance. But the trial judge may properly take such an explanation (or lack of one) into account in assessing the likelihood that the class of vehicles at issue is defective. In the circumstances of this case, where NHTSA sought to show the existence of a defect through circumstantial evidence, the trial judge could properly take cognizance of NHTSA's acknowledged failure to offer an engineering explanation of the skidding incidents.[16]

The consumer reports of performance failure proffered as evidence by NHTSA in this case, however, were viewed by the District Court as adequate to put GM to the burden of adducing evidence that the skidding incidents were the result of causes other than vehicle malfunction. Nonetheless, the burden of persuasion to show that the incidents were, more probably than not, the result of a class-wide defect remained with NHTSA.

2

NHTSA makes an altogether different argument in relying upon the *relative*

complaint rates of X-cars and other vehicles to provide the critical inferential link between vehicle skidding and vehicle malfunction. NHTSA contends that, even if the drivers themselves were not competent to assess whether their mishaps were the result of a peculiarity with the vehicle, a difference in the relative rates of complaint would tend to affix responsibility for the problem on the vehicle rather than other factors.

That evidence, NHTSA argues, points powerfully to the existence of a defect. Indeed, NHTSA charges that "the 1980 X-car has been the subject of the largest number of reports of ... 'yaw instability' of any car in NHTSA's history." *Id.* at 1569. But there is a missing link in the chain of inferences leading from the fact of consumer complaints to the conclusion of vehicular defect. GM pointed, persuasively to the District Court, to a factor *other than vehicle malfunction* that accounted for the high rate of complaints about the X-cars, namely, the adverse publicity flowing from NHTSA's release of a film-clip of an X-car spinning out of control.[17] The film-clip was witnessed by an estimated 53 million viewers on network television. In addition, thousands of newspaper articles and follow-up television stories recited NHTSA's allegations of defective X-car brake performance. Brief for the Motor Vehicle Manufacturers Association of the United States, Inc., and the Product Liabili-

---

**15.** In denying GM's Rule 41(b) motion to dismiss and requiring GM to go forward, the District Court appeared to rule, without directly holding, that the Government had met its burden to establish a *prima facie* case. In effect, the testimony of consumers describing incidents of aberrant performance of their automobiles was viewed as sufficient to put GM to the burden of adducing evidence that such mishaps were not the result of a malfunction in the vehicle. GM does not now assert error in the District Court's failure to grant the motion to dismiss, *see* Transcript of Oral Argument at 24, and we have no occasion to opine on whether GM's motion should have been granted at that stage of the case.

**16.** The lack of an engineering explanation for the alleged defect made it difficult for NHTSA to suggest remedial steps GM might take in

response. To be sure, that is not the Government's burden, inasmuch as the ultimate (and obviously last resort) remedies of refund or replacement of the vehicle itself are also available under the Act. § 1414(a)(2)(A)(ii) and (iii).

**17.** The dramatization was inherently provocative. NHTSA specifically arranged for the X-car to be driven on a slippery surface in a way calculated to cause the car to skid. The driver was required to refrain from modulating the brakes or steering in response. J.A. at 1720–21, 1849. Curiously, when it released the film-clip, NHTSA did not inform the media of the test protocol or otherwise indicate that the test did not simulate actual driving conditions. NHTSA has since adopted an internal policy requiring that test protocols be disclosed when test films are released. J.A. at 1402.

ty Advisory Council, Inc. as Amici Curiae at 32.

The effects of the flood tide of adverse publicity are abundantly evident in this record. Out of the sampling of complaints that NHTSA analyzed as "consistent with" rear-wheel lock-up, ninety-one percent allude to the complainants' awareness of adverse publicity about the X-car. J.A. at 1606, 993–1012. What is more, GM and NHTSA received more reports of X-car skidding in the two weeks following the television newscast than in the previous 3½ years combined. *See* J.A. at 756.

The Government responds that a large number of complaints were received *before* the adverse publicity in January 1983. The Government points to the District Court's finding that "GM itself had received some 700 complaints" before the adverse national publicity, 656 F.Supp. at 1569 n. 32, and the trial judge's observation at the end of his opinion that "the true reasons for the X-car's unusually high pre-publicity complaint rate may never be known." *Id.* at 1581 n. 55.

We are unpersuaded. First, the reference to *pre*-publicity is something of a misnomer. In fact, adverse publicity about the X-car did not commence with the 1983 television newscast. A *Car & Driver* magazine report published in 1979 criticized the manual transmission X-car (which GM did recall) on the ground that its rear wheels locked under certain circumstances prior to its front wheels. But more importantly, the differences between the complaint rates on all *current configuration* X-cars—cars still on the road after two re-calls—and a number of competitive models were negligible.[18] Although many models had received no (or virtually no) complaints, thirteen models had complaint rates that were comparable to or higher than that of the current configuration X-car.[19] Furthermore, prior to the massive adverse publicity in January 1983, GM and NHTSA had received only 124 complaints of skidding events concerning the 611,651 current-configuration X-cars. J.A. at 1267. This rate of pre-publicity complaints was comparable to that for cars as to which NHTSA terminated its investigations with no finding of a defect. J.A. at 576. Indeed, the pre-January 1983 complaint rate for these current configuration X-cars was slightly *lower* than the complaint rate for 1967–1972 Dodge Darts and Plymouth Valiants, vehicles as to which NHTSA closed out rear-brake lock-up investigations with no determinations that defects existed. J.A. at 1268.[20]

GM's evidence, in our view, rebutted the inference sought to be drawn by the Government. The point is not that consumers who complained about the X-car did not in fact experience the events complained of, but that they were led to complain in such *relatively* large numbers because of the adverse publicity surrounding the X-car's brake system. Under these unusual (indeed unique) circumstances, *see supra* note 17, the trial court could appropriately find that the Government's evidence failed to show that the *actual incidence* of the phenomenon complained of was greater for the X-car than for comparable vehicle classes.

---

18. As we previously described, the earlier re-calls eventuated in the elimination of more aggressive braking systems in comparison with current configuration X-cars. *See supra* note 11 & pp. 401–402.

19. GM's analysis showed that manual-transmission X-cars—all of which were eventually recalled by GM—experienced a complaint rate of 35 complaints per 100,000 vehicles. GM's automatic-transmission X-cars, by contrast, experienced a complaint rate of about 4 complaints per 100,000 vehicles. *See* J.A. at 663, 1983.

20. As the District Court pointed out, had NHTSA's consumer-complaints evidence supported the inference of a defect,

> then the internal GM documents might supply convincing corroboration of GM's knowledge of the "defect" from the outset. As it is, without proof that there is, or ever was, a "defect," they prove only that brake engineers have yet to devise the infallible braking system, and that GM's engineers, as well as their counterparts elsewhere in the industry, continue in quest of it, and also continue to argue, sometimes heatedly, about how its imperfect substitute should work in the meantime.

656 F.Supp. at 1581.

## B

■ The Government next argues that the District Court incorrectly relied upon the test data produced during the course of this litigation. First, the Government contends that no matter how much testing GM did, testing cannot show that the "thousands of performance failures did not happen." Brief for the United States at 15. In consequence, the Government maintains, testing should not have been allowed to rebut NHTSA's *prima facie* case. Once NHTSA established its *prime facie* case, the argument goes, GM can rebut the Government's case in only one of two ways: *first,* under *Wheels,* by establishing as "an affirmative defense that the failures were attributable to gross and unforeseeable owner abuse or unforeseeable neglect of vehicle maintenance," 518 F.2d at 438; or, *second,* under Judge Leventhal's approach in *Pitman Arms,* by showing that the defect occurs only in circumstances that render it non-dangerous (typically, low speeds or parking maneuvers). 561 F.2d at 930–31 (Leventhal, J., concurring and dissenting).

But there is a problem with the Government's theory. Where, as here, the Government's case is built on circumstantial evidence of performance failure, we are confronted with a starkly different situation from the scenarios in either *Wheels* or *Pitman Arms.* There, the record abounded with broken wheels and failed pitman arms. Both represented tell-tale, eloquent manifestations of a defect. Skidding is not a defect and, as the patient reader will recall, may not even be indicative of a defect. Vehicles will inevitably skid under the "right" concatenation of circumstances; wheels will not inevitably break during the ordinary life of the vehicle, nor will pitman arms inevitably fail.

In view of this distinction, it was entirely appropriate for the District Court to consider GM's testing data in rebuttal to the charge that vehicle malfunction was responsible for the incidents described by the consumer complaints. In that respect, GM's evidence tended to show, *first,* that

causes other than vehicle malfunction could (indeed, usually) cause the skidding phenomenon about which consumers complained; and *second,* through examining the X-car's braking performance in comparison with competitive cars, that the X-car was no more likely than other vehicles to be involved in such incidents. Indeed, it would have been odd for the District Court to have dismissed all this data as irrelevant in assessing the probabilities that the vehicle, rather than other factors, was responsible for the mishaps.

The Government next argues that "even if such evidence [from testing data] could be relied upon in the abstract, it was improper for the district court to rely upon the test data produced in this case." Brief for the United States at 40. The Government charges that the data is thrice flawed: (1) the tests were not predictive of actual performance; (2) the "peer cars" selected for comparison were not representative; and (3) an inadequate number of cars was tested.

In our view, a misconception about the role of GM's testing underlies each of the Government's points. The Government contends that "[t]he bottom line here is that GM cannot as a matter of law win this case on the basis of the litigation-inspired testing because that testing did not show that the numerous incidents of a performance defect did not happen or were the fault of the drivers. The testing could only be used to support some other rebuttal evidence." Reply Brief for the United States at 19.

But in reality the testing evidence at issue here was not aimed at mounting an affirmative defense; the data was designed to influence the trier of fact's assessment of the probabilities that a malfunction was responsible for the incidents of which the drivers complained. To return to the basic premises of the case: NHTSA's theory was to show, through circumstantial evidence drawn primarily from consumer complaints (and the relative number of those complaints)[21] that GM's 1980 X-cars were de-

21. Buttressed by internal GM documents. *See supra* note 20.

fective by virtue of the rear wheels' tendency to lock up prematurely. What GM's evidence demonstrated, "conclusively" in the words of the District Court, 656 F.Supp. at 1573, was that *the rear wheels of X-cars had no more tendency to lock up than those of other cars; that, in fact, the brake balance of X-cars is closer to the ideal than that of many other cars; and finally that, as a group, the X-cars' brake balance is nearly ideal. Id.* Tellingly, NHTSA's own tests confirmed all this. J.A. at 283, 285, 452–56. This testing, at a minimum, significantly altered the probabilities that a defect in the vehicle, as opposed to other factors, was responsible for the skidding incidents. And the District Court therefore did not err in taking this evidence into account. We see nothing in the broad terms of the Act which would call into question, much less preclude, the trier of fact's consideration of evidence that, fairly viewed, is highly probative as to the existence *vel non* of a defect.

### C

The Government's remaining arguments go, more modestly, to the weight that the District Court should have given the evidence. The Government faults both the selection of "peer" cars chosen for comparison with the X-car and the number of cars tested. The Government claims that the "peer" cars were predominantly rear-wheel drive cars, which are ordinarily rear biased. From this, the Government complains that it was inappropriate to compare the brake performance of these cars with the front-wheel drive X-car.

NHTSA had ample opportunity to raise these two arguments before the trial judge. It is not entirely clear to us that the agency did so, but even if it did, we find no reason to overturn the District Court's weighing of the evidence. Although NHTSA may now deem the number of front-wheel drive cars tested unsatisfactorily low, the parties did in fact test many competitive front-wheel drive cars. Unfortunately for NHTSA, the tests revealed that most were more likely to lock their rear wheels first than X-cars. J.A. at 1245, 1226, 1230–31,

1241, 1243. Indeed, NHTSA's own tests revealed that nearly all of the competitive front-wheel drive cars examined by the agency locked their rear wheels first under ordinary road conditions. J.A. at 455–56, 1225–26.

Similarly, a large number of cars were tested. Over three hundred X-cars, including 71 that had been the subject of consumer complaints, and 528 peer cars were run through the testing gauntlet. Those impressive numbers stand in rebuke to the Government's claim that an insufficient sample was used.

### D

Last, the Government asserts error in the District Court's dismissal of Counts III, IV (alleging the inadequacy of the 1981 and 1983 recalls), and VI (failure to include "hotline" information). The District Court dismissed all three counts on the basis of its finding that NHTSA had failed to carry its burden to show a safety-related defect. The District Court reasoned that, since GM was "legally a volunteer" in conducting both recalls, 656 F.Supp. at 1581, it incurred no obligation to comply with the remedial provisions of the Act or NHTSA's regulations.

The Government argues that, even assuming that *current configuration* X-cars were not defective, the only way in which they could have been brought to that condition was through the two prior recalls that GM conducted. The Government reasons that, at the very least, GM's 1983 recall shows that its 1981 recall was inadequate to correct the deficiencies.

We are persuaded, however, that GM's actions as to *both* recalls were voluntary. Under the regulatory framework established by the Act, GM never incurred an obligation to conduct either recall. In the ensuing litigation, the Government failed to carry its burden of proof to show that *any* configuration of the X-car was defective. The District Court therefore found that NHTSA was "without proof that there is, or ever was, a 'defect'" in GM's X-cars. *Id.* Indeed, Judge Jackson squarely held that "the proof fails to establish that the

1980 X-cars were defective, or that GM had or should have determined that they were...." *Id.*

Fairly read, the thrust of the Government's efforts at trial was to show a defect in the *entire class* of GM's 1980 model X-cars. The Government's case was not aimed at isolating earlier configurations to show that these earlier iterations, at the very least, were defective. Indeed, the Government's theory of the case was precisely otherwise. Failing to prove that GM knew, or should have known, that any particular configuration of its X-cars was defective, the Government cannot now succeed in its claim that GM incurred a duty to conduct its recalls within the terms of the Act. GM's recalls, while perhaps coerced as a practical matter by virtue of the agency's threat of litigation, were nonetheless voluntary as a matter of law.

## VIII

As Judge Jackson essentially concluded, this case is, upon analysis, highly fact-specific. We therefore have no occasion to opine definitively, as the Government would have us do, on the precise contours of the role consumer-complaint evidence appropriately plays under the Act. We hold only that the District Court did not err in ruling that the Government, even if it did establish a *prima facie* case, failed to carry its ultimate burden under the Act to demonstrate the existence of a class-wide defect.

For the foregoing reasons, the judgment of the District Court is

*Affirmed.*